MAURICE TONGATE *et al.*, Plaintiffs-Appellants, v. WYETH LABORA-
TORIES, Defendant-Appellee.

First District (6th Division) No. 1—90—0053

Opinion filed August 16, 1991.—Modified on denial of rehearing
November 15, 1991.

Paul R. O'Malley and Thomas D. Nissen, both of Paul R. O'Malley, Ltd., of Chicago, for appellants.

954

Wildman, Harrold, Allen & Dixon, of Chicago (Richard C. Bartelt, Ruth E. VanDemark, David A. Kanter, Francine J. Aren, and Frank T. Rivas, of counsel), for appellee.

JUSTICE EGAN delivered the opinion of the court:

The plaintiffs, Maurice Tongate and his wife Constance Tongate, filed a complaint against Wyeth Laboratories (Wyeth) and Elston Industrial Clinic (Elston). The initial complaint and subsequent amended complaints alleged that after Maurice Tongate injured his finger at work he was taken to Elston, where he was given an injection of tetanus toxoid manufactured by Wyeth, and as a result of his receiving the injection he suffered severe and permanent neurological impairment. The complaints alleged that Elston was negligent because its agents failed to take a complete history from Tongate to determine whether the use of tetanus toxoid was contraindicated. The complaint against Wyeth alleged that the tetanus toxoid was unreasonably dangerous for its intended and foreseeable purposes because it failed to contain an adequate warning that would inform medical personnel of the possibility of an allergic reaction resulting in neurological impairment.

The trial judge granted summary judgment in favor of Wyeth and denied the plaintiffs leave to file an amendment to their complaint. The judge stayed the proceedings against Elston until this appeal has been completed. The plaintiffs contend that the order granting summary judgment and the order denying their motion to file an amendment are both erroneous.

Tongate testified at his deposition that on January 25, 1978, he injured his hand while at work, and he was taken to Elston. When he arrived at Elston, he was asked to fill out "a little yellow card," and he was asked if he had ever had a number of different diseases and allergies. He answered that he had had rose fever. A doctor, later identified as Emilo Beltran, told a nurse to give Tongate a tetanus shot. Tongate told the nurse that he had previously received a tetanus shot, and he did not think he needed one. Beltran explained to him that it was the procedure and it was for his own good. Tongate asked the doctor, "Why do I need that?" The doctor said, "Why, did you have one?" Tongate told him that he had one about five or six years ago. He added, "You know, I don't think I need it." Beltran then said, "Well, five, six years ago, that's long enough, we can give you another one." (In his deposition, Beltran denied that the plaintiff ever suggested that he did not need the injection.) Tongate did not remem-

ber telling Beltran anything more about his previous tetanus shot. A nurse gave Tongate the tetanus shot in his left shoulder.

In February Tongate went to see his family doctor complaining about numbness in his hands and feet. By May he felt more affected in the ankles, groin, knees and wrists when he moved. In June he began to experience "flatfootedness," stinging in his mouth and difficulty in swallowing fluids. In July, after he found himself catching his breath and falling down, he saw Dr. Neil Allen, board certified in neurology and internal medicine.

Dr. Allen asked Tongate if he had had any injections, and Tongate asked whether a tetanus shot could have caused his problem. Dr. Allen told him that it could have caused the problem and asked Tongate to find out what type of tetanus injection he had been given. Dr. Allen diagnosed Tongate's condition as "acute polyneuritis" caused by an allergic reaction to the tetanus injection.

Tongate was examined by Dr. Kranzler, a neurologist, who told Tongate he believed his problems were caused by the tetanus injection. He subsequently went to Edgewater Hospital where he remained for one month; he was treated by Dr. Allen. On Dr. Allen's advice, Tongate contacted Dr. Sahgal at the Rehabilitation Institute of Chicago, and he was treated there during April, May and June of 1979. The doctors at the institute told Tongate that he had Guillain-Barre syndrome, a form of polyneuritis.

When Tongate's deposition was taken on January 14, 1982, he was having plasma phoresis, a procedure in which blood plasma is removed. He was using crutches and a brace in his shoe because of foot drop.

A more detailed recitation of additional evidence is required when addressing the various arguments raised by the parties. For the sake of brevity, we will not recite them at this point. We would add, however, that this case centers on the information contained in "inserts" which are placed in each package of the tetanus toxoid manufactured by Wyeth. Wyeth maintains that summary judgment in its favor is required because the information contained in the inserts provided in each of the packages containing the tetanus toxoid was adequate as a matter of law; it cannot be liable based on the "learned intermediary" rule; and it cannot be liable because Dr. Beltran did not rely on the information provided in Wyeth's inserts when he prescribed the tetanus toxoid.

The plaintiffs maintain in their reply brief that Wyeth has waived the argument that the inserts were adequate as a matter of law on the ground that Wyeth did not raise that argument in its motion for

summary judgment. As appellee, Wyeth responded correctly that we may affirm on any ground "so long as the factual basis for such [ground] was before the trial court." (*Shaw v. Lorenz* (1969), 42 Ill. 2d 246, 248, 246 N.E.2d 285, 287.) The issue is whether or not there is a factual basis in the record for Wyeth's argument. Pursuant to our request during oral argument, Wyeth has referred us to those parts of the record which it claims will show that it did raise the argument in the trial court. We have examined those parts of the record, and we judge that Wyeth did not properly raise the argument in the trial court.

The grounds for summary judgment should be pleaded with sufficient specificity to alert the opposing party to what he must answer and the trial judge to what he may be expected to pass on. Wyeth's motion for summary judgment was based solely on the claim that Wyeth owed no obligation to warn the plaintiff, that its only obligation was to warn Dr. Beltran and that Dr. Beltran had sufficient information from both Wyeth *and other sources* to enable him to act as a learned intermediary. In its memorandum in support of its motion Wyeth denied that its warnings on the tetanus toxoid vaccine were inadequate and asserted that it would "present evidence in support of its defenses at trial." It pointedly added: "For purposes of this motion, however, it is unnecessary to consider those issues, as the evidence before this Court is that the prescribing physician has testified that he knew of anecdotal reports of [the condition of which the plaintiff complains] following Tetanus Toxoid Administration in the medicine literature." Wyeth's reply memorandum stated in bold type: "The learned intermediary doctrine focuses on the defendant's 'duty' to warn; not the adequacy of the warning provided." It is clear, therefore, that the motion for summary judgment itself and the memoranda of Wyeth did not inform the judge that he was being asked to pass on the sufficiency of the information provided by Wyeth.

Wyeth also refers us to parts of the record in which its attorney expressed disagreement with any assertion that its inserts were inadequate. In our judgment, those remarks of Wyeth's attorney in response to statements made by the plaintiff's attorney do not meet the requirements of the law. Indeed, at one point, Wyeth's attorney took issue with the assertion by the plaintiff's attorney that the inserts were inadequate and at the same time conceded, "This really is not relevant to the motion." For these reasons, we conclude that Wyeth has not properly preserved the argument that summary judgment should be granted on the ground that the warnings provided by Wyeth in its inserts were adequate as a matter of law. See *Beverly*

*Bank v. Alsip Bank* (1982), 106 Ill. App. 3d 1012, 436 N.E.2d 598; *Mollihan v. Stephany* (1975), 35 Ill. App. 3d 101, 340 N.E.2d 627, *appeal on other grounds after remand* (1977), 52 Ill. App. 3d 1034, 368 N.E.2d 465.

 Nevertheless, we have considered the argument and examined the record. The plaintiffs submitted the depositions of Dr. James T. O'Donnell, who held a doctorate degree in pharmacy, and Dr. Neil Allen. Both Dr. O'Donnell and Dr. Allen expressed the opinion that the warnings contained in the package inserts supplied by Wyeth were inadequate. Dr. O'Donnell was critical of Wyeth for failure to report neurological reactions and to warn of the dangers and contraindications connected with previous neurological reactions. Dr. Allen testified that, because enough information had previously been given in the medical literature on the association of tetanus toxoid with Guillain-Barre syndrome, "it should, in fact, be listed as a potential complication."

Dr. Mahlon Bierly was the administrative assistant for marketed biologics and a member of the medical communications section for Wyeth responsible for the content of the warnings contained in the package insert for tetanus toxoid throughout the 1970's and 1980's. He testified that before 1978 he knew of reports of neurological events that had followed the administration of tetanus toxoid. Despite that knowledge there had never been any reference in the package inserts to the "reports of neurological events that had followed the administration of tetanus toxoid" before 1987. Dr. Bierly testified that in 1987 Wyeth revised its package inserts, in part, as follows:

"*CONTRAINDICATIONS*: Use of this product is contraindicated in persons with a history of neurologic or severe hypersensitivity reaction following a previous dose.

*WARNINGS*: Occurrence of neurologic disorders have been reported following administration of tetanus toxoid containing preparations. Central and peripheral nervous system disorders that have been temporally associated with the use of tetanus toxoid include *** Guillain-Barre Syndrome ***. A causal relationship has not been established."

In our judgment, Dr. Bierly's testimony buttresses the plaintiff's argument. No question of the admissibility of Dr. Bierly's testimony has been suggested by Wyeth. (*Cf. Northern Trust Co. v. Upjohn Co.* (1991), 213 Ill. App. 3d 390 (subsequent amendment of inserts held inadmissible).) We conclude that whether the inserts were inadequate is a question of fact that could not be resolved by summary judgment. Our conclusion would be the same in the absence of the testimony of

Dr. Bierly. Wyeth has cited cases which held warnings to be adequate as a matter of law. Suffice it to say that they are factually distinguishable.

■ We turn now to Wyeth's principal argument that the trial judge properly entered summary judgment in its favor based on the "learned intermediary" rule, which was adopted in Illinois in *Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 513 N.E.2d 387:

> "[The learned intermediary] rule, as adopted in numerous jurisdictions, provides that manufacturers of prescription drugs have a duty to warn prescribing physicians of the drugs' known dangerous propensities, and the physicians, in turn, using their medical judgment, have a duty to convey the warnings to their patients. [Citations.]" (117 Ill. 2d at 517-18.)

The court explained further:

> "The drug manufacturer generally communicates warnings relating to prescription drugs to the medical profession through package inserts, the Physicians' Desk Reference, 'Dear Doctor' letters, detailmen, and through other measures. [Citations.] The doctor, functioning as a learned intermediary between the prescription drug manufacturer and the patient, decides which available drug best fits the patient's needs and chooses which facts from the various warnings should be conveyed to the patient, and the extent of disclosure is a matter of medical judgment. [Citations.] As such, we believe the learned intermediary doctrine is applicable here and that there is no duty on the part of manufacturers of prescription drugs to directly warn patients. Certainly, if the manufacturer of a prescription drug has no duty to directly warn the user of the drug of possible adverse effects, it has no duty to warn a nonuser as [the plaintiff]." 117 Ill. 2d at 519.

While *Kirk* instructs us as to the applicable rule, it is factually of no assistance in determining the question before us. In *Kirk* the plaintiff was injured while a passenger driven in a car by a person who had been given two prescription drugs. The complaint against the drug manufacturers alleged that the drugs were unreasonably dangerous because the manufacturer failed to warn that the drugs would diminish the physical and mental abilities of the driver. The supreme court upheld the dismissal of the complaint on the ground that the sequence of events that led to the plaintiff's injuries was not reasonably foreseeable to the drug manufacturers. We emphasize that the driver, who had used the drug, was a defendant, not a plaintiff, in the action.

We also emphasize, as the dissenting opinion points out, that the majority assumed that the warnings were adequate. See 117 Ill. 2d at 538 (Simon, J., concurring in part & dissenting in part).

Wyeth maintains that the learned intermediary rule is applicable, and the drug manufacturer exonerated, if it is shown that the intermediary physician was properly warned, regardless of the source of the warning, of any potential dangers in the use of the drug and regardless of the inadequacy of the warning provided by the drug manufacturer. (See *Felix v. Hoffmann-LaRoche, Inc.* (Fla. 1989), 540 So. 2d 102.) The plaintiff does not disagree with that argument of Wyeth. The issue, therefore, is whether the record establishes, as a matter of law, that Dr. Beltran possessed sufficient information from any source that would show that he was properly warned before he prescribed the drug. A resolution of that question depends almost entirely on two depositions given by Dr. Beltran.

Dr. Beltran first gave a discovery deposition on August 25, 1983, in which he discussed his knowledge of tetanus toxoid. He testified that he was aware of three contraindications, or situations in which a drug should not be administered, for tetanus toxoid: (1) the patient has received tetanus toxoid within the last five years; (2) the patient has a present acute illness, such as a high fever, sore throat, or upper respiratory infection; and (3) the patient has a previous allergy to tetanus toxoid. He explained that a previous allergy is "very important," and noted that an example of an allergic reaction is one where a patient's whole body "swells up." The following exchange then occurred between Tongate's attorney and Dr. Beltran:

"Q. Doctor, have you ever heard of a severe reaction to vaccines called post-vaccinal polyneuritis?

A. Heard about it, but I don't have any experience of following it or seeing a case.

Q. You heard about it in connection with this case, I imagine, or did you know about it before?

A. Before that, before that.

Q. Were you aware before January 25, 1978, that there is—it had been known that a small percentage of people had had rather severe reactions to vaccines called post-vaccinal polyneuritis?

A. Yes, sir."

Dr. Beltran further testified that he believed the handbook provided by Elston contained a section on tetanus toxoid; however, he said that he only looked at the handbook "in passing" because he felt confident about relying on the protocol developed by Medical Emer-

gency Service Associates (MESA), his full-time employer. He also testified that he was "familiar" with the insert that came in the multiple dosage box of Wyeth's tetanus toxoid, and that he read it every once in a while. Tongate's attorney asked Dr. Beltran if he had had an occasion to refer to the Wyeth package insert for information in connection with his use of tetanus toxoid; Dr. Beltran replied, "No, sir."

Based on Dr. Beltran's deposition, the trial judge entered summary judgment for Wyeth. He said that he was "convinced that Dr. Beltran was informed of the specific risks that were involved in this type of situation."

The plaintiffs filed a motion to reconsider and a motion for subpoenas to take the evidence depositions of Dr. Beltran and Dr. Schiff, Beltran's employer. The trial judge allowed the plaintiffs to take those evidence depositions. At his evidence deposition, Dr. Beltran was asked a series of complex questions directed toward whether he had ever been aware of any warnings that severe neurological damage could be caused by an injection of tetanus toxoid. To all of these questions Dr. Beltran answered, "No, sir." He further testified as follows:

"Q. Doctor, have you had an opportunity to review and read the transcript of your discovery deposition taken on August 25, 1983 in this matter?

A. Yes, sir.

Q. Okay. Specifically, I want to draw your attention to page 106 where you provided responses to certain questions regarding your awareness of post-vaccinal polyneuritis. Do you recall answering yes to the question 'Were you aware prior to January 25, 1978, that it had been known that a small percentage of people had had rather severe reactions to vaccines called post-vaccinal polyneuritis?' Do you recall that?

A. Yes, sir.

Q. You may recall that the questions asked of you on page 106 were about vaccines generally, not Tetanus Toxoid Adsorbed specifically. Now, specifically, what was your awareness before January 25, 1978, as to persons experiencing post-vaccinal polyneuritis following the use of Tetanus Toxoid Adsorbed vaccine?

A. I had not heard of any.

Q. Okay. Would you explain what you meant when you said on page 106 of your discovery deposition that you were aware of the fact that a small percentage of people had severe reactions to vaccines called post-vaccinal polyneuritis?

A. I was referring more on the swine flu and the DPT.

Q. Okay. The DPT and swine flu are separate and distinct vaccines, are they not?

A. Yes, sir."

Dr. Beltran later testified that even if the package insert had been revised to include warnings of neurologic reactions, he still would not have transmitted those warnings to Tongate. However, after taking a short break, he testified that if the package insert had included warnings of neurologic reactions and if he had been aware of Tongate's previous neurologic reactions following tetanus toxoid injections, he would have asked Tongate "to contact his personal physician, to verify the allergic reaction" and have the personal physician give the injection if indicated. Dr. Beltran added that if the patient was being difficult, he would "consult with the communicable disease control people about their opinion."

In their motion to reconsider, the plaintiffs argued that Dr. Beltran's testimony at his evidence deposition confirmed that the judge had misconstrued Dr. Beltran's earlier testimony in finding that he had been fully informed of the risks associated with tetanus toxoid.

Wyeth responded that the judge should not consider Dr. Beltran's evidence deposition, arguing that the plaintiffs were bound by Dr. Beltran's earlier unequivocal testimony at his discovery deposition. Wyeth further argued that it was entitled to summary judgment for the additional reason that Dr. Beltran testified that he had not relied on Wyeth's package insert.

The trial judge accepted Dr. Beltran's deposition but adhered to his original decision and granted summary judgment. He said that "one of the key things" is Dr. Beltran's statement "that the insert did not play a role in his decision."

We must first address the threshold issue of whether Dr. Beltran's second deposition may properly be considered. Wyeth argues that the evidence deposition contradicts Dr. Beltran's earlier testimony and, therefore, it may not be considered in support of the plaintiffs' motion to reconsider. Wyeth relies on *Hansen v. Ruby Construction Co.* (1987), 155 Ill. App. 3d 475, 508 N.E.2d 301, and *Commonwealth Eastern Mortgage Co. v. Williams* (1987), 163 Ill. App. 3d 103, 516 N.E.2d 515.

In *Hansen*, the plaintiff testified at his deposition that he had tripped over a rubber strip on a loading dock and fell. Later he executed an affidavit stating that he had actually tripped over a different object. The appellate court upheld summary judgment for the defendant, noting that the plaintiff's deposition testimony was unequivocal and constituted a binding judicial admission. In *Commonwealth East-*

*ern Mortgage Co.*, the defendant testified at a deposition that the terms of a mortgage were not discussed. After the motion for summary judgment was filed, the defendant filed an affidavit in which he stated what the terms of the mortgage were to be. The appellate court held that the affidavit directly contradicted the deposition testimony and refused to consider the affidavit on review.

The holdings of *Hansen* and *Commonwealth Eastern Mortgage Co.* were extended to a party's expert witness in *Adelman-Tremblay v. Jewel Cos.* (7th Cir. 1988), 859 F.2d 517, also cited by Wyeth, in which the court stated:

> "The rule against creating 'sham' issues by submitting affidavits that contradict prior depositions thus far has been applied only to parties. [Citations.] We can think of no reason, however, not to apply this rule to the present case involving the testimony and affidavit of the plaintiffs [*sic*] sole expert witness. The purpose of summary judgment motions—'to weed out unfounded claims, specious denials, and sham defenses' [citation]—is served by a rule that prevents a party from creating issues of credibility by allowing one of its witnesses to contradict his own prior testimony." 859 F.2d at 521.

See also *Rohrbough v. Wyeth Laboratories, Inc.* (N.D. W. Va. 1989), 719 F. Supp. 470 (a statement in an expert's affidavit that contradicts earlier deposition testimony may be disregarded if it constitutes an attempt by the nonmoving party to create a sham issue of fact).

■ We have a serious question whether Dr. Beltran's testimony is subject to the judicial admission rule. He is not a party, and he is not an expert witness in this case; he is an occurrence witness. But even if his testimony were subject to the rule, we believe that his discovery deposition was not so clear and unequivocal that his evidence deposition may be considered contradictory to the discovery deposition. At his discovery deposition he was asked if he had ever heard of a severe reaction "to vaccines." He was not asked specifically if he had heard of severe reactions to tetanus toxoid vaccines. Consequently, his subsequent testimony that he was referring "more on" swine flu and DPT vaccines, although arguably ambiguous, could be considered to explain his previous answer and to show that he did not refer to tetanus toxoid vaccines in his discovery deposition. See *Schmall v. Village of Addison* (1988), 171 Ill. App. 3d 344, 525 N.E.2d 258.

■ We turn now to the question of whether the evidence establishes, as a matter of law, that Dr. Beltran had prior knowledge from any source that tetanus toxoid could cause polyneuritis.

Dr. Beltran's testimony at both depositions shows that he had read Wyeth's insert from time to time. He was "familiar" with the insert. He looked at the handbook provided by Elston only "in passing" because he felt confident about relying on the protocol developed by MESA; consequently, the record shows that Dr. Beltran's information came from the insert and the MESA protocol. However, the MESA protocol also did not contain any contraindications for the use of tetanus toxoid.

In addition, Dr. Beltran testified that he was not aware before January 25, 1978, that tetanus toxoid could cause severe neurologic reactions; that there might be an association between tetanus toxoid booster shots and severe neurologic disorders; that persons with previous neurologic reactions to tetanus toxoid boosters were more likely to experience severe neurologic reactions; and that booster shots of tetanus toxoid were contraindicated for tetanus-prone injuries in persons having a history of a neurologic reaction following a previous booster shot of tetanus toxoid. He also testified that before January 25, 1978, he had never read or become familiar with any authoritative medical literature, package inserts or Physicians' Desk Reference (PDR) monographs for tetanus toxoid which warned physicians that a .5 cc booster shot of tetanus toxoid, which he always prescribed, could cause severe neurologic reactions.

If Dr. Beltran's testimony is to be believed, a fact finder could conclude that he had not been sufficiently warned that tetanus toxoid could cause polyneuritis. That being so, he would not be a learned intermediary.

Wyeth also argues that the record establishes, as a matter of law, that Dr. Beltran did not rely upon the Wyeth inserts when he prescribed the tetanus toxoid and that, therefore, the plaintiff is unable to establish a causal connection between any lack of information in its inserts and the injuries suffered by the plaintiff. (See *Batteast v. Wyeth Laboratories, Inc.* (1990), 137 Ill. 2d 175, 560 N.E.2d 315.) In support of its argument Wyeth cites *Ashman v. SK & F Lab Co.* (N.D. Ill. 1988), 702 F. Supp. 1401, and *Formella v. Ciba-Geigy Corp.* (1980), 100 Mich. App. 649, 300 N.W.2d 356.

In *Formella*, the plaintiff, an elderly woman, complained to her physician of low back pain. He prescribed Tandearil. She returned to his office in two weeks, and he continued the drug treatment. No blood tests were conducted at any time during her treatment. About six weeks later, the plaintiff called the physician to complain of multiple bruises and tiredness. He immediately suspected that Tandearil had caused her to develop a blood dyscrasia. He ordered her to stop

taking the drug and to report to a hospital for tests. His suspicions were confirmed. The plaintiff was extremely ill from the aplastic anemia which had occurred as a direct result of taking Tandearil.

One of the claims against the defendant drug manufacturer was that it failed to adequately warn the physician of the dangers of the drug. The appellate court affirmed the order directing a verdict in favor of the defendant and pointed out that the plaintiff's own expert had testified that the PDR warning and *package insert warning were adequate,* if read. The court concluded that the fact that the physician failed to read the package inserts and the PDR negated any possible negligence on the part of the defendant and that the physician's negligence was the intervening, independent and sole proximate cause of the plaintiff's illness. We do not see how the *Formella* case supports Wyeth's position. As we have previously noted, whether the Wyeth insert warnings were sufficient is a question of fact that cannot be decided on summary judgment.

In *Ashman,* the plaintiff's physician prescribed a drug, Tagamet, which was manufactured by the defendant. The physician subsequently prescribed Ativan, a sleeping pill, not manufactured by the defendant. The two drugs were co-administered for two years with no side effects. Two years later the physician prescribed the drug Halcion in place of Ativan. Before he prescribed the Halcion the physician consulted the package insert for Halcion and the Physicians' Desk Reference. Both the insert and the PDR discussed a potential interaction between Halcion and Tagamet. Nevertheless, the physician decided to prescribe Halcion even though there were other sleeping pills available. The Tagamet label did not specifically mention the interactive propensities of the drug with Halcion. While the physician had read the Tagamet label on previous occasions, he did not read it when making the decision whether to prescribe Halcion for the plaintiff.

The plaintiff ingested Tagamet, and four hours later he took the Halcion. The next morning he took an overdose of Ativan tablets which he had left over from the old prescription. He was then taken to a hospital in an unconscious state. His physician was not sure what had caused the plaintiff's condition but suspected cerebral hemorrhage and decided to do a lumbar puncture to confirm. Despite the fact that the plaintiff regained consciousness and was in a coherent state, the physician decided to proceed with the lumbar puncture. As a result of alleged negligence in the performance of the lumbar puncture, the plaintiff was partially paralyzed. The plaintiff's claim alleged that the defendant failed to provide an adequate warning of the inter-

active propensities of the two drugs. The district court granted summary judgment on two grounds: the injury caused by the negligence of the physician was not reasonably foreseeable and the physician was a learned intermediary.

Wyeth argues here that *Ashman* is applicable because the physician, as the district court noted, did not read the Tagamet label when he prescribed Halcion and, in this case, Dr. Beltran testified that he did not "refer" to the Wyeth insert "for information in connection with [his] use of tetanus toxoid." We believe that Wyeth has elevated an isolated fact of the *Ashman* case and an isolated fact in this case to an undeserved significance. First, in *Ashman,* the plaintiff conceded that the physician was a learned intermediary. (*Ashman,* 702 F. Supp. at 1404.) No such concession is present in this case; to the contrary. In addition, the district court held that the evidence clearly established that the physician was aware of the possible interactive effect when Tagamet and Halcion were co-administered. The plaintiffs' own expert[1] testified that, based on the information provided both in the Halcion literature and the PDR, the interaction which occurred in the plaintiff was predictable. The district court pointed to the fact that there was no evidence that the physician consulted the Tagamet label at the time he prescribed the Halcion in response to the plaintiffs' argument that the failure to include a warning on the Tagamet label misled the physician.

We do not agree that Dr. Beltran's testimony establishes as a matter of law that he did not, to use Wyeth's word, "rely" on Wyeth's insert. We set out the following pertinent testimony of Dr. Beltran:

"Q. Now, while you have been at Elston Industrial Medical Center, have you had occasion to receive any literature from Wyeth Laboratories pertaining to Tetanus Toxoid Adsorbed?

A. That's included in the box, insert, multiple dosage box.

Q. You are familiar with the insert, the package insert that comes with the product when it's delivered; is that right?

A. Yes.

Q. Have you had occasion to read that over from time to time?

A. Yes, sir.

\* \* \*

Q. Are you familiar with the package inserts that come with Tetanus Toxoid Adsorbed?

---

[1]The expert was Dr. James O'Donnell, the same expert who testified in this case.

A. I read that every once in a while.

\* \* \*

Q. I want to show you what I have marked as Beltran Exhibit No. 2 which is a package insert of Wyeth Tetanus Toxoid Adsorbed, and ask you if prior to January 25, 1978, you have had a chance to read and review a document like that?

A. Yes, I have read it.

Q. Generally similar to that?

A. Yes.

Q. Okay. This is the type of thing that's found folded up in the package?

A. In the box, yes.

Q. If I understand you correctly, however, you have adopted protocols for its use associated with the emergency medicine practice that you have at Northwest Community Hospital; right?

A. Yes, sir.

Q. And you—have you had an occasion to refer to a package insert similar to the one marked as Beltran Exhibit No. 2 for information in connection with your use of Tetanus Toxoid?

A. No, sir."

Since the case is before us on summary judgment, the issue is not whether the record shows that it is more probably true than not true that Wyeth's negligence was the proximate cause of the plaintiff's injury. Instead, the issue is whether Wyeth's failure to provide adequate warnings may have proximately caused Tongate's injury. *Gatlin v. Ruder* (1990), 137 Ill. 2d 284, 560 N.E.2d 586.

■ We are unwilling to accept, as a matter of law, the conclusion that when Dr. Beltran, whose native language is not English, said he did not "refer" to the insert, he meant that he did not take into consideration the information (or lack of information) contained in the insert when he prescribed the tetanus toxoid for Tongate. It is reasonable to construe Dr. Beltran's testimony as a statement that he did not reread the Wyeth insert each time he prescribed tetanus toxoid. *Cf. Richards v. Upjohn Co.* (1980), 95 N.M. 675, 625 P.2d 1192 (witness testified it is not standard medical practice to reread the PDR every time a drug is given.)

Some cases from other jurisdictions are instructive. In *Mazur v. Merck & Co.* (E.D. Pa. 1990), 742 F. Supp. 239, a physician testified that he considered the defendant's package insert, the recommendations of the United States Center for Disease Control and the results of his own research before he selected the vaccine he prescribed. The

defendant argued that even if it failed to provide an adequate warning, the physician's "reliance on [nondefendant] sources of information about" the vaccine was the "true proximate cause" of the plaintiff's illness. (742 F. Supp. at 262.) The district court ruled that "[t]here can be more than one proximate cause of an injury—and whether any inadequacy in the package circular was a substantial factor in causing harm to [the plaintiff], or whether what [the physician] did or failed to do caused that harm, or both, is a jury question." 742 F. Supp. at 263.

■ In two jurisdictions it has been held that a rebuttable presumption exists that a failure to warn was a proximate cause of the injury: *Graham v. Wyeth Laboratories* (D. Kan. 1987), 666 F. Supp. 1483 (citing Kansas law); *Williams v. Lederle Laboratories* (S.D. Ohio 1984), 591 F. Supp. 381 (citing Ohio law). In the case before us, there is evidence from which a fact finder could conclude that the warnings were inadequate. The evidence clearly shows that Dr. Beltran read the Wyeth inserts from time to time. The evidence also established that, if Dr. Beltran had been aware of Tongate's previous neurologic reactions following tetanus toxoid injections, he would have asked Tongate to "contact his personal physician to verify the allergic reaction" and have the personal physician give the injection if indicated. In our judgment, the record establishes, at least, a rebuttable presumption that the failure to provide an adequate warning was a contributing cause of Tongate's injury. The right to summary judgment must be clear and free from doubt. (*Pyne v. Witmer* (1989), 129 Ill. 2d 351, 543 N.E.2d 1304.) Wyeth has not established that right. A fact question remains as to whether the warnings were adequate and, if inadequate, whether the absence of an adequate warning may have proximately caused Tongate's injury.

■ The defendant also argues that Dr. Beltran would not have learned of Tongate's sensitivity to tetanus toxoid even if Dr. Beltran had been aware of the warnings which the plaintiffs' expert testified were required. It bases its argument, not on Dr. Beltran's testimony, but on Tongate's testimony that he did not realize that he had suffered neurological symptoms in the past. The plaintiffs claim that this argument was never raised in the trial court and is, therefore, waived. To refute that argument the defendant has referred us to the plaintiffs' motion to reconsider the order granting summary judgment, the defendant's response, the plaintiffs' reply and the oral argument heard on the motion to reconsider. Since we have decided to address the defendant's argument, we need not decide the question of waiver. Suffice it to say that, after reading the pertinent parts of the

record, it is our judgment that if the defendant avoided waiver, it did so by the narrowest of margins. The principal thrust of the defendant's argument on the motion to reconsider was that Tongate's testimony concerning the adverse reactions he had had to tetanus toxoid inoculations before 1978 was entitled to no weight.

At his deposition Dr. Beltran was asked what he would have done if he had been aware of the contraindications, warnings and adverse reactions contained in Wyeth's 1986-87 revised package insert. He said that if that information had been contained in the package insert and if he had known that the plaintiff had experienced neurological reactions after previous tetanus toxoid booster shots he would not have prescribed another tetanus toxoid shot. He further testified that, if he had learned through questioning that the defendant had had what the doctor felt was a neurological reaction after a previous tetanus toxoid shot, he would have told the plaintiff to contact his personal physician to verify the allergic reaction and Dr. Beltran would leave it up to his personal physician to administer the shot. If he had difficulty convincing the patient, Dr. Beltran might have consulted with the communicable disease control people at the Center for Disease Control asking "about the situation."

The plaintiffs filed Tongate's affidavit in the motion to reconsider which was in part a repetition of his deposition testimony. In his affidavit he testified that before the tetanus toxoid shot he received on January 25, 1978, he had at least two other tetanus booster shots, one in 1972 when he was about 20 years old and another shot sometime before the age 10. Following the previous booster shots of tetanus toxoid he remembers that he experienced unsteadiness and weakness with unusual loss of sensation in both his hands and arms lasting for several weeks to a month. The loss of sensation, particularly in his hands and fingers, appeared as numbness with intermittent tingling. He did not experience pain, and the loss of temporary nerve sensation was not constant and appeared to completely "resolve" after about a month. At that time he had no reason to believe that he might have been experiencing a neurological reaction to the tetanus toxoid booster shots.

Tongate had previously testified at his deposition that Dr. Beltran never asked whether he had any allergies or reactions to medications generally or to tetanus toxoid specifically. He was asked by a woman receptionist before being treated by Beltran if he was allergic to penicillin or sulfa, and he responded, "No."

Also submitted on the motion to reconsider was the affidavit of Dr. Allen dated November 21, 1989, a considerable period after Dr.

Beltran's deposition had been taken. In that affidavit Dr. Allen said that the package insert warnings for tetanus toxoid before January 1978 *and the 1986-87 revised package insert* provided by Wyeth contained inadequate warnings to the prescribing physician. Dr. Allen was specifically critical of the failure of Wyeth's warning to contain a requirement that a patient should be advised and *questioned by the prescribing physician about whether the patient's history of previous tetanus inoculations was followed by any unusual neurological events or reactions. It was his opinion that simply asking patients whether they had had any allergies to medication was insufficient to elicit the history necessary for a physician to make an informed medical judgment to prescribe a tetanus toxoid booster.*

It is the defendant's position that even if Dr. Beltran had asked Tongate whether he had suffered any unusual neuorological events or reactions following previous tetanus booster shots, Tongate would have answered, "No," because Tongate was not aware in 1978 that he had suffered unusual neuorological events or reactions. We can only speculate as to what Tongate would have said if he had been asked expressly by Dr. Beltran about previous reactions to tetanus shots. We certainly cannot accept, as a matter of law, the conclusion of fact advanced by the defendant.

For these reasons, the order granting summary judgment is reversed and the cause remanded for further proceedings.

The plaintiffs also maintain that the judge abused his discretion in refusing to allow the plaintiffs to amend their complaint to allege a new theory of liability. The complaint was filed March 31, 1980, and a second amended complaint was filed December 12, 1980, to include the claim of Constance Tongate for lack of consortium. On March 21, 1989, the plaintiffs presented a motion for leave to file a third amended complaint. Counts III and VI alleged that Wyeth's tetanus toxoid was unreasonably dangerous for its intended and foreseeable purposes for four reasons, three of which had previously been pleaded. Subparagraph (d) was as follows:

> "Failed to warn of the necessity that an adequate history requires inquiry as to whether the patient had any nonlocal or systemic neurological reactions to previous [tetanus toxoid adsorbed] inoculations."

At a hearing on the plaintiffs' motion on March 21, 1989, the judge entered and continued the motion for hearing before the assigned trial judge. The plaintiffs filed their third amended complaint on March 21, 1989, and Wyeth filed its answer denying the material allegations directed against it in counts III and VI.

On June 29, 1989, the plaintiffs served Wyeth's counsel with notice that on July 6, 1989, they would present a "A Motion for Leave to File Plaintiffs' Third Amended Complaint Previously Filed on 3/21/89." However, unlike the third amended complaint filed on March 21, 1989, paragraph six of the complaint contained a fifth subparagraph labeled "e" alleging that the tetanus toxoid was unreasonably dangerous because: "Wyeth failed to maintain an adequate system of adverse drug experience investigation and reporting."

At the hearing on July 6, 1989, before the trial judge, Wyeth's attorney objected to paragraphs (d) and (e) of paragraph six arguing that Wyeth would be prejudiced by the addition of a new theory of liability after discovery had been closed and after the case had been pending for nine years. The trial judge sustained the objection to subparagraph (e) and overruled the objection to subparagraph (d), and entered an order granting the plaintiffs leave to file their third amended complaint *instanter* with the exception of paragraph 6(e).

The plaintiffs argue that the trial judge's refusal to allow them to amend their complaint to add subparagraph (e) was an abuse of discretion. They maintain that subparagraph (e) was added because of statements made by Dr. O'Donnell during his deposition, and they emphasize that their third amended complaint was filed "shortly after" his deposition. However, the defendant points out that subparagraph (e) was not a part of the third amended complaint filed on March 21, 1989.

■ A trial court has broad discretion in motions to amend pleadings before the entry of final judgment, and a denial of a motion to amend is not erroneous unless there has been a manifest abuse of discretion. (*Starnes v. International Harvester Co.* (1989), 184 Ill. App. 3d 199, 539 N.E.2d 1372.) The factors to consider in evaluating the trial court's discretion in allowing a motion to amend a pleading are: (1) whether the proposed amendments would cure the defective pleadings, (2) whether they would cause prejudice or surprise to the defendants, (3) the timeliness of the proposed amendments, and (4) whether previous opportunities to amend the pleadings could be identified. (*Starnes*, 184 Ill. App. 3d at 205.) In this case, the plaintiffs' motion for leave to file their amended complaint came five weeks before trial, after discovery had been closed and after the case had been pending for nine years. As in *Starnes*, the plaintiffs had a previous opportunity to add a new cause of action, and this new claim could prejudice the defendant, as the defendant would need additional time to prepare its response. Under these facts, we cannot say that the trial judge abused his discretion in denying leave to file paragraph

6(e) of the plaintiffs' third amended complaint. The order denying leave to file subparagraph (e) is affirmed.

Judgment affirmed in part, and reversed and remanded in part.

RAKOWSKI, P.J., and McNAMARA, J., concur.