# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Mitsias v. I-Flow Corp.*, 2011 IL App (1st) 101126

---

| | |
|---|---|
| Appellate Court Caption | ANGELA MITSIAS, a/k/a Angel Mitsias, Plaintiff-Appellant, v. I-FLOW CORPORATION, STRYKER CORPORATION, and STRYKER SALES CORPORATION, Defendants-Appellees (STEVEN LEVIN, M.D., Defendant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-1126 |
| Filed | September 23, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising following plaintiff's shoulder surgery and the diagnosis of glenohumeral chondrolysis, the destruction of cartilage in the shoulder joint, the trial court erred in dismissing plaintiff's product liability action against the manufacturers of the pain pump used to administer the anesthetic Marcaine during the surgery as barred by the two-year statute of limitations, even though that action was filed six years after her medical malpractice action was filed against the surgeon, since the statute of limitations does not begin to run with regard to a second source of an injury until it becomes discoverable through diligent inquiry, and in plaintiff's case, she knew her injury was caused by one source, but remained unaware of another source that could not be discovered earlier through the exercise of diligent inquiry. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-01633; the Hon. John A. Ward, Judge, presiding. |

| Judgment | Reversed and remanded. |
|---|---|
| Counsel on Appeal | Bruce D. Goodman, Peter M. Dapier, and Bradley D. Steinberg, all of Steinberg, Goodman & Kalish, of Chicago, for appellant. |
| | Paul E. Wojcicki and Matthew C. Jardine, both of Segal McCambridge Singer & Mahoney, Ltd., of Chicago, for appellee I-Flow Corporation. |
| | Anthony J. Anscombe and C. Kinnier Lastimosa, both of Sedgwick, Detert, Moran & Arnold LLP, of Chicago, for appellees Stryker Corporation and Stryker Sales Corporation. |
| Panel | JUSTICE J. GORDON delivered the judgment of the court, with opinion. Presiding Justice Epstein and Justice McBride concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiff appeals the dismissal of her products liability suit against I-Flow Corporation, Stryker Corporation, and Stryker Sales Corporation (collectively, the product liability defendants) as time-barred under the two-year limitations period for product liability actions as set forth in section 13-213(d) of the Code of Civil Procedure (735 ILCS 5/13-213(d) (West 2008)).

¶ 2    Dr. Steven Levin performed surgery on plaintiff's left shoulder on October 24, 2001. Subsequently, plaintiff experienced severe pain in her shoulder and was diagnosed with glenohumeral chondrolysis, the destruction of cartilage in the shoulder joint. On October 22, 2003, plaintiff filed an initial medical malpractice suit against Dr. Levin. (Dr. Levin is not a party to the instant appeal.) During the course of discovery in that suit, plaintiff's expert Dr. Anthony Romeo was deposed in two phases, namely, on August 9, 2006, and on October 24, 2007. On August 9, 2006, he testified that the administration of a particular anesthetic agent via a continuous infusion device, also known as a "pain pump," had been shown to be "highly associated" with loss of articular cartilage. On October 24, 2007, at the second phase of his deposition, Dr. Romeo testified that recently published medical literature suggested a link between pain pumps and plaintiff's condition.

¶ 3    Based upon this second deposition, on November 12, 2008, plaintiff voluntarily nonsuited her medical malpractice action. She then refiled her malpractice claims against Dr. Levin on February 11, 2009, adding two product liability counts sounding in strict liability

and negligence against the pain pump manufacturers, which are the product liability defendants in the instant appeal.

¶ 4 The product liability defendants filed motions to dismiss plaintiff's product liability claims as untimely. The trial court granted their motions to dismiss. Plaintiff now appeals. For the reasons that follow, we reverse and remand.

¶ 5                                                    I. BACKGROUND

¶ 6 The facts as alleged by plaintiff are as follows. Plaintiff injured her left shoulder while exercising on August 19, 2001. On October 24, 2001, Dr. Levin performed orthopedic surgery on her shoulder at Alexian Brothers Medical Center. As a part of the surgery, Dr. Levin installed a pain pump in plaintiff's left shoulder in order to release Marcaine, a local anesthetic, into the surrounding area during the postoperative recovery period. Following surgery, plaintiff allegedly experienced severe pain in her left shoulder and a significant reduction in its range of motion. As noted, she was eventually diagnosed with glenohumeral chondrolysis, the destruction of "articular cartilage," *i.e.*, joint cartilage, in the shoulder.

¶ 7 On October 22, 2003, plaintiff filed her initial medical malpractice suit against Dr. Levin and Alexian Brothers Medical Center, alleging direct negligence on the part of Dr. Levin and direct negligence and *respondeat superior* liability on the part of Alexian Brothers Medical Center. Plaintiff did not assert any claims against the product liability defendants in that action.

¶ 8 On August 9, 2006, during the course of discovery, the parties deposed plaintiff's physician, Dr. Romeo. In response to questioning by counsel for Dr. Levin, Dr. Romeo listed three possible ways in which performance of the subject surgery could cause cartilage loss, including the following:

> "A third possibility which has become more apparent recently is the use of an interarticular anesthetic agent, particularly a medicine called Marcaine, and so the use of a postoperative interarticular pain pump, which I'm not aware of whether that was done or not, has been shown over the last year-and-a-half to two years to be highly associated with a condition where articular cartilage is aggressively lost in the shoulder after arthroscopic stabilization."

Later in that same deposition, counsel for plaintiff asked Dr. Romeo about the use of Marcaine pain pumps as a potential cause of plaintiff's condition, and Dr. Romeo answered that "in the last year and a half there's been a growing body of evidence that this can cause cartilage death or necrosis and lead to the loss of cartilage in a shoulder."

¶ 9 On October 24, 2007, at the second phase of his deposition, Dr. Romeo testified to a link between the use of pain pumps and glenohumeral chondrolysis:

> "Q. In 2007, is it recognized in the literature that the use of Marcaine pain pumps can, in fact, be a cause for loss or destruction of articular cartilage at the glenohumeral joint space?
>
>     A. Yes."

Dr. Romeo further testified that the connection between pain pumps and glenohumeral

chondrolysis "was not known" in 2001 when Dr. Levin performed surgery on plaintiff and was not discovered until "a few years later."

¶ 10    Plaintiff voluntarily dismissed her initial medical malpractice action on November 12, 2008. Subsequently, on February 11, 2009, plaintiff filed the instant suit, once more seeking damages against Dr. Levin on a medical malpractice theory and adding claims against the product liability defendants on theories of strict liability and negligence.

¶ 11    The product liability defendants filed motions to dismiss plaintiff's complaint as untimely pursuant to the two-year limitations period for product liability actions as stated in section 13-213(d) of the Code of Civil Procedure (735 ILCS 5/13-213(d) (West 2008)). The product liability defendants argued that, at the latest, the statutory limitations period for plaintiff's product liability claims began to run on the day that plaintiff filed her initial action in 2003, because upon the filing of such a claim Illinois law deemed her to be aware of an injury wrongfully caused. In response, plaintiff argued that the limitations period would not begin until October 24, 2007, the date of Dr. Romeo's second deposition session, at which she first became aware of the potential link between the use of a pain pump during her surgery and her injury.

¶ 12    In opposition to the product liability defendants' motion to dismiss, plaintiff filed an affidavit by Dr. Romeo in which he stated:

> "It is my understanding, and opinion to a reasonable degree of medical certainty, that any information concerning potential chondrolysis caused by the wrongful use of pain pumps did not occur by publication for which a patient or other lay person might realize that chondrolysis might be wrongfully caused by pain pumps or their design or lack of warnings or instructions until the summer of 2007."

Dr. Romeo acknowledged that, in his deposition on August 9, 2006, he had mentioned that plaintiff's injuries could have been caused by the use of a pain pump to deliver an anesthetic. However, he stated:

> "[M]y testimony only reflected the length of time and the amount of medication that was delivered by the pain pump, and was not intended nor did it reflect any information that any pain pump may be potentially unsafe or had lack of warnings. *** At my deposition on August 9, 2006, I had no information, and when asked, imparted no information to Mr. Goodman [plaintiff's attorney], that the pain pumps were unsafe or unreasonably dangerous, or negligently designed or manufactured."

¶ 13    On January 14, 2010, the trial court granted the product liability defendants' motion to dismiss, explaining:

> "I ruled on the pure legal issue as to whether or not once a plaintiff is put on inquiry notice that they were injured and that the injury was wrongfully caused, and I accept the premise that by filing a malpractice suit against the medical defendants, there's no doubt that there was that notice generated early and that some of the dates are a little cloudy in my head, but I think it was 2001 or 2002 that that trigger date as to the med mal defendants served as a trigger date for all purposes, defendants, all causes of action. So, that the statute of limitations as to the product liability case would start on that same date."

The trial court further acknowledged that, under this construction of the discovery rule, "it could well be argued that prior to your ability to file in good faith a products liability case, that statute has already left."

¶ 14     The next day, on January 15, 2010, upon plaintiff's motion, the trial court granted plaintiff leave to file an amended complaint and struck the previously entered dismissals. In her amended complaint, plaintiff added the factual allegation that, prior to the summer of 2007, she could not have discovered that the pain pump used by Dr. Levin might have been the cause of her injury, because "[p]rior to the summer of 2007, information concerning potential chondrolysis caused by pain pumps did not exist. There was no information available that chondrolysis may be wrongfully caused by pain pumps or their design or lack of safe, suitable or proper warnings until the summer of 2007."

¶ 15     Following a hearing that day, the court again granted the product liability defendants' motions to dismiss the claims against them. The trial court also issued a finding under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) that there was no just reason to delay enforcement or appeal of its order. This appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17     On appeal, plaintiff contends that the statute of limitations for her product liability claim should only begin to run when plaintiff knew or should have known that her injury was wrongfully caused by a product, rather than when she knew or should have known that her injury was wrongfully caused without regard to any specific source. She additionally contends that a contrary interpretation of the discovery rule would deny her rights under the due process and equal protection provisions of the United States and Illinois Constitutions. The product liability defendants contest each of these contentions. They additionally argue that, in any event, plaintiff knew or should have known that her injury was wrongfully caused by a product no later than August 9, 2006, the date of Dr. Romeo's first deposition, during which he mentioned the use of a pain pump in connection with her injury. Thus, they claim that even under the interpretation of the discovery rule advocated by plaintiff, her February 11, 2009, suit was still untimely.

¶ 18                                         A

¶ 19     The central issue in this case is how the discovery rule is applied when a plaintiff is aware that her injury might have been wrongfully caused by one source but is unaware that her injury might have been caused by another source and, in fact, could not be aware of that source because the causal link was as yet unknown to science. Defendants contend that as soon as an injured plaintiff becomes aware that her injury might have been wrongfully caused by *any* source, the plaintiff is under a duty to inquire as to *all* potential sources, and the statute of limitations therefore begins to run as to all causes of action, even causes of action that would not be discoverable at that time. Under such a rule, the statute of limitations on all claims resulting from plaintiff's injury would have started to run no later than October 22, 2003, the date upon which she filed her initial malpractice lawsuit against Dr. Levin, since she was certainly alerted to the possibility of some form of wrongful conduct at that point,

even if she did not yet have any means of discovering that she had been injured by defendants' product. Plaintiff, on the other hand, contends that where a particular cause of action would not be discoverable through reasonable diligence, the statute of limitations as to that particular cause of action should be tolled until that cause of action becomes discoverable, even if the statute of limitations has already started to run as to other causes of action arising out of the same injury. Thus, the statute would not begin to run on plaintiff's products liability claim until plaintiff knew or had reason to know that her injury could have been wrongfully caused by a product, which she asserts did not occur until Dr. Romeo's testimony regarding pain pumps at the second session of his deposition on October 24, 2007.

¶ 20    The statute of limitations for products liability actions, which governs the instant appeal, is set forth in section 13-213 of the Code of Civil Procedure and provides, in relevant part:

> "(d) Notwithstanding the provisions of subsection (b) and paragraph (2) of subsection (c) if the injury complained of occurs within any of the periods provided by subsection (b) and paragraph (2) of subsection (c), *the plaintiff may bring an action within 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, of the existence of the personal injury, death or property damage*, but in no event shall such action be brought more than 8 years after the date on which such personal injury, death or property damage occurred." (Emphasis added.) 735 ILCS 5/13-213(d) (West 2008).

¶ 21    In applying the two-year statute of limitations set forth in section 13-213(d) and similar statutes of limitations, Illinois courts have adopted a "discovery rule," which serves to "postpone the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should have known that he has been injured and that his injury was wrongfully caused." *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 361, 657 N.E.2d 894, 898 (1995) (citing *Rozny v. Marnul*, 43 Ill. 2d 54, 72-73, 250 N.E.2d 656, 665-66 (1969)); see also *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 169, 421 N.E.2d 864, 868 (1981) ("the cause of action accrues when the plaintiff knows or reasonably should know of an injury and also knows or reasonably should know that the injury was caused by the wrongful acts of another"). Our supreme court in *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 430 N.E.2d 976 (1982), explained the discovery rule in Illinois as follows:

> "This court has recently considered the discovery rule in depth in two cases, and has adopted a construction of the rule which can be termed neither narrow nor expansive. That is, we have held that the event which triggers the running of the statutory period is not the first knowledge the injured person has of his injury, and, at the other extreme, we have also held that it is not the acquisition of knowledge that one has a cause of action against another for an injury he has suffered. Rather, *** the statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Knox*, 88 Ill. 2d at 414-15, 430 N.E.2d at 980.

Our supreme court has explained that this rule is intended to encourage diligent investigation on the part of potential plaintiffs without foreclosing claims of which plaintiffs could not have been aware, stating, "In that way, an injured person is not held to a standard of knowing

the inherently unknowable [citation], yet once it reasonably appears that an injury was wrongfully caused, the party may not slumber on his rights." *Nolan*, 85 Ill. 2d at 171, 421 N.E.2d at 868 (citing *Urie v. Thompson*, 337 U.S. 163, 169 (1949)); see *Rozny*, 43 Ill. 2d at 70, 250 N.E.2d at 665 (discovery rule has been designed to mitigate "the hardship to the plaintiff who neither knows nor should have known of the existence of his right to sue"); *Lipsey v. Michael Reese Hospital*, 46 Ill. 2d 32, 41, 262 N.E.2d 450, 455 (1970) ("It is manifestly unrealistic and unfair to bar a negligently injured party's cause of action before he had had an opportunity to discover that it exists.").

¶ 22   The notion of "wrongful cause," as it has been developed by courts in Illinois, has two elements: that of cause and that of wrongfulness. With regard to the first element, plaintiff must have sufficient information to conclude that her injury was caused by the acts of another. *Nolan*, 85 Ill. 2d at 169, 421 N.E.2d at 868; *Roper v. Markle*, 59 Ill. App. 3d 706, 710, 375 N.E.2d 934, 938 (1978) (it is a prerequisite for the triggering of the statute of limitations that the injured plaintiff has actual or constructive knowledge of "the possibility that someone is at fault for [the injury's] existence"). If the plaintiff is not aware that someone may be "at fault" for her injury, then the statute of limitations will not begin to run. *Roper*, 59 Ill. App. 3d at 711, 375 N.E.2d at 938 ("That in some types of cases an awareness of a physical problem also carries with it awareness of its wrongful causation, does not dictate a triggering of the limitations period in all malpractice cases when one becomes aware solely of a physical problem."). Thus, for instance, in *Nolan*, where an asbestos worker who contracted asbestosis brought suit against the manufacturers, sellers, and distributors of asbestos products, the court held that the statute of limitations did not begin to run until he had sufficient information to conclude that his condition was caused by exposure to asbestos materials at work, even though he had allegedly been aware of his lung problems for many years prior to his receipt of such information. *Nolan*, 85 Ill. 2d at 171-72, 421 N.E.2d at 869. Similarly, in *Roper*, 59 Ill. App. 3d at 712, 375 N.E.2d at 939, cited with approval in *Nolan*, 85 Ill. 2d at 170, 421 N.E.2d at 868, where a negligently performed hysterectomy caused plaintiff's kidney to become infected, the statute of limitations did not begin to run until plaintiff had reason to know of the possibility that her kidney infection was the result of the actions of the doctor who performed the hysterectomy, rather than by some nonnegligent organic cause.

¶ 23   As for the element of wrongfulness, an injured plaintiff should reasonably know that her injury is wrongfully caused, and the statute of limitations begins to run, as soon as she has sufficient information about her injury and its cause to spark inquiry in a reasonable person as to whether the conduct of the party who caused her injury might be legally actionable. *Knox*, 88 Ill. 2d at 416, 430 N.E.2d at 980; *cf. Nair v. Bloom*, 383 Ill. App. 3d 867, 871, 890 N.E.2d 1113, 1116-17 (2008) (statute of limitations was not triggered where, shortly following abdominal surgery, plaintiff experienced pain and weakness in her legs but was reassured by her physicians that this was a common side effect of abdominal surgeries). At this point, the burden is upon the injured plaintiff to investigate whether she has a viable cause of action. *Knox*, 88 Ill. 2d at 416, 430 N.E.2d at 980 (stressing "the rule and obligation of the person to make diligent inquiry" once she knows or reasonably should know of her injury and that it is wrongfully caused).

¶ 24    Knowledge of "wrongful cause" does not require knowledge on the part of plaintiff that the defendant's conduct fits the technical legal definition of negligence or that all the legal elements of a particular cause of action are otherwise satisfied. *Knox*, 88 Ill. 2d at 415-16, 430 N.E.2d at 980. However, it still requires that plaintiff is or should be aware of some possible fault on the part of the defendant, as has been elucidated by the cases following *Knox*. Thus, courts have held that reasonable knowledge of wrongful cause requires more than a mere suspicion that wrongdoing might have occurred, if that suspicion is not yet supported by facts known to plaintiff:

> "[S]uspecting wrongdoing clearly is not the same as knowing that a wrong was probably committed. *** The trier of fact must examine the factual circumstances upon which the suspicions are predicated and determine if they would lead a reasonable person to believe that wrongful conduct was involved. The fact that a party suspects wrongful conduct, without examining the reasons underlying those suspicions, is not enough to constitute constructive knowledge that an injury was wrongfully caused." *Young v. McKiegue*, 303 Ill. App. 3d 380, 390, 708 N.E.2d 493, 501 (1999).

See *LaManna v. G.D. Searle & Co.*, 204 Ill. App. 3d 211, 218 (1990) ("Plainly, suspicion is not the same as reasonably knowing."). For instance, in *Young*, shortly after decedent's death, the plaintiff widow questioned doctors about the care received by decedent. *Young*, 303 Ill. App. 3d at 383, 708 N.E.2d at 497. The *Young* court held that her mere suspicion that something might have gone wrong was insufficient to determine as a matter of law that she knew or should reasonably have known that decedent's death was wrongfully caused at that time. *Young*, 303 Ill. App. 3d at 390, 708 N.E.2d at 501.

¶ 25    Our supreme court has not directly addressed the operation of the statute of limitations where a plaintiff is aware that her injury might have been wrongfully caused by one source, but could not as yet have been aware of another potential source at that time. However, in defining the contours of the discovery rule in *Nolan* and *Knox*, our supreme court looks for guidance to the United States Supreme Court decision of *United States v. Kubrick*, 444 U.S. 111 (1979), in which the Court implied that the beginning of the period of limitations would depend upon the discoverability of the claim at issue.

¶ 26    The *Kubrick* plaintiff brought suit in 1972 to recover for a hearing loss allegedly caused by medical malpractice in a Veterans Administration hospital. *Kubrick*, 444 U.S. at 114. He was aware in 1969 that the probable cause of his hearing loss was an antibiotic he received at the hospital, but not until 1971 was he informed by a physician that the antibiotic should not have been administered. *Kubrick*, 444 U.S. at 114. The *Kubrick* Court held that the statute of limitations began to run in 1969, that is, at the time plaintiff was aware of his injury and the cause of his injury, even though he had not yet been told that the treatment at issue was a violation of the standard of care. *Kubrick*, 444 U.S. at 122. (As noted, this is the same formulation of the discovery rule adopted by our supreme court, namely, that the period of limitations begins when plaintiff knows or reasonably should know of her injury and its cause. See *Knox*, 88 Ill. 2d at 416, 430 N.E.2d at 980; *Nolan*, 85 Ill. 2d at 169, 421 N.E.2d at 868.) The *Kubrick* Court explained:

"We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. *There are others who can tell him if he has been wronged, and he need only ask.* If he does ask and if the defendant has failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff." (Emphasis added.) *Kubrick*, 444 U.S. at 122.

With regard to the facts of the case at hand, the *Kubrick* Court stated that, given the trial court's factual finding that the treatment at issue violated the standard of care, which was not contested on appeal, plaintiff "need only have made inquiry among doctors with average training and experience in such matters to have discovered that he probably had a good cause of action." *Kubrick*, 444 U.S. at 122-23. The Court further stated, "If there exists in the community a generally applicable standard of care with respect to the treatment of his ailment, we see no reason to suppose that competent advice would not be available to the plaintiff as to whether his treatment conformed to that standard." *Kubrick*, 444 U.S. at 123-24.

¶ 27    Thus, the fact that plaintiff could have discovered his cause of action within the statutory period through reasonable diligence forms a central part of the *Kubrick* Court's analysis. As noted, the need for plaintiffs to investigate their potential claims with reasonable diligence has likewise shaped the development of the discovery rule in Illinois. See *Knox*, 88 Ill. 2d at 416, 430 N.E.2d at 980 (stating "the rule and obligation of the [injured] person to make diligent inquiry" (citing *Witherell v. Weimer*, 85 Ill. 2d 146, 156, 421 N.E.2d 869, 874 (1981) (once an injured person knows or should reasonably know that he is injured and that his injury was wrongfully caused, "the burden is upon the injured person to inquire further"))); see *Nolan*, 85 Ill. 2d at 171, 421 N.E.2d at 868 ("once it reasonably appears that an injury was wrongfully caused, the party may not slumber on his rights"). Although the *Kubrick* Court had no occasion to consider a scenario in which the cause of action would not be discoverable through reasonable diligence, it seems likely that a different result would obtain, since the rule articulated by the Court is founded upon the presumption of discoverability.

¶ 28    The present case, as noted, requires us to rule upon the operation of the discovery rule in a situation where a plaintiff is aware of one potential wrongful cause of her injury, but she does not yet know, nor could she reasonably discover, a second potential wrongful cause, because the state of our scientific knowledge is as yet inadequate to unearth that second cause. Permitting knowledge of the one to trigger the discovery rule as to the other would seem to defeat the policy and purpose behind the discovery rule, which is to accommodate the need of the victim, upon reasonable inquiry, to discover her cause of action against a defendant who has wronged her. Therefore, where plaintiff has discovered one cause of her injury, but has not and, in fact, could not have discovered a second cause, tolling the statute of limitations with regard to that second claim until such time as "[t]here are others who can

tell him if he has been wronged, and he need only ask" (*Kubrick*, 444 U.S. at 122) would seem to be a logical extension of the *Kubrick* decision, as well as one that flows from our supreme court's concern that plaintiffs conduct diligent inquiry into potential causes of action without slumbering on their rights.

¶ 29 In the instant case, accepting the allegations in plaintiff's amended complaint as true, plaintiff did not slumber on her rights. She brought a timely medical malpractice suit within two years of her injury, and her delay in bringing her products liability suit was not due to any lack of diligence on her part but, rather, to the fact that the scientific community was not aware of the dangers associated with pain pumps until the summer of 2007. Indeed, while there may be a question of fact as to when the link between pain pumps and chondrolysis became known to science, there is no question that plaintiff could not have known of any potential products liability cause of action against the pain pump manufacturers while the causal link between her injury and the pain pump used upon her was not scientifically discoverable. As has been discussed, our supreme court has expressed concern that plaintiffs should not be "held to a standard of knowing the inherently unknowable." *Nolan*, 85 Ill. 2d at 171, 421 N.E.2d at 868 (citing *Urie*, 337 U.S. at 169); see *Lipsey*, 46 Ill. 2d at 41, 262 N.E.2d at 455 ("It is manifestly unrealistic and unfair to bar a negligently injured party's cause of action before he has had an opportunity to discover that it exists."). If we were to adopt defendants' proposed construction of the discovery rule, holding that the statute of limitations on plaintiff's products liability claim began to run and, in fact, expired at a time when it was yet unknowable, we would be doing precisely that which the *Nolan* court sought to avoid.

¶ 30 Plaintiff additionally contends, and we agree, that the rule she urges comports with the statutory scheme enacted by the legislature with regard to products liability claims, as reflected in section 13-213 of the Code of Civil Procedure:

> "(b) Subject to the provisions of subsections (c) and (d) no product liability action based on any theory or doctrine shall be commenced except within the applicable limitations period and, in any event, within 12 years from the date of first sale, lease or delivery of possession by a seller or 10 years from the date of first sale, lease or delivery of possession to its initial user, consumer, or other non-seller, whichever period expires earlier, of any product unit that is claimed to have injured or damaged the plaintiff ***.
>
> ***
>
> (d) Notwithstanding the provisions of subsection (b) and paragraph (2) of subsection (c) if the injury complained of occurs within any of the periods provided by subsection (b) and paragraph (2) of subsection (c), the plaintiff may bring an action within 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, of the existence of the personal injury, death or property damage, but in no event shall such action be brought more than 8 years after the date on which such personal injury, death or property damage occurred." 735 ILCS 5/13-213 (West 2008).

Thus, the products liability statute makes a clear distinction between the statute of repose,

which is either 10 years or 12 years depending on the product's sales history, and the statute of limitations for products liability actions, which is 2 years from the date that the plaintiff discovers her injury. 735 ILCS 5/13-213 (West 2008). The statute further limits liability by stating that product liability actions based on injury, regardless of the time of discovery, must be brought within eight years of the injury, thus creating a rigid span of time after which recovery is impossible regardless of whether plaintiff's failure to discover her claim was due to any lack of diligence on her part. 735 ILCS 5/13-213(d) (West 2008). The interpretation of the discovery rule urged by defendants in this appeal would disrupt this statutory scheme in cases such as the present one by, in effect, transforming the two-year statute of limitations into a new statute of repose, since it would serve as an absolute bar on liability on claims that are not discoverable within that two-year period, as long as plaintiff has been alerted to the potential presence of at least one other claim.

¶ 31        Thus, in keeping with the statute itself, the thrust of *Kubrick* as cited with approval by our supreme court in *Nolan* and *Knox*, and our supreme court's concern that plaintiffs should investigate their claims with diligence without being "held to a standard of knowing the inherently unknowable" (*Nolan*, 85 Ill. 2d at 171, 421 N.E.2d at 868 (citing *Urie*, 337 U.S. at 169)), we hold that, where a plaintiff knows or should reasonably know that her injury was caused by one source, but remains unaware of another source that could not be discovered through the exercise of diligent inquiry, the statute of limitations does not begin to run with regard to that second source until such time as that second source would become discoverable through diligent inquiry.

¶ 32        Defendants argue that our holding is contrary to the language of *Knox*, citing *Knox* for the proposition that "the statute [of limitations] is *not* triggered with 'the acquisition of knowledge that one has a *cause of action* against another for an injury he has suffered.' " (Emphasis in original.) See *Knox*, 88 Ill. 2d at 415, 430 N.E.2d at 980. However, in context, the *Knox* court was not purporting to state that a cause of action can accrue before a plaintiff could possibly have known of its existence through the exercise of reasonable diligence. As noted, the *Knox* court did not directly address such a situation. Rather, the *Knox* court was elaborating on the threshold of knowledge required for a plaintiff to be aware that her injury is "wrongfully caused": plaintiff does not need to be aware that she has a viable cause of action, for such awareness " 'assumes a conclusion which must properly await legal determination.' " *Knox*, 88 Ill. 2d at 415, 430 N.E.2d at 980. Thus, as noted, a plaintiff's duty of inquiry begins well before she can be certain that defendant's conduct satisfies all elements of a particular cause of action, as long as she is aware that her injury might have been "wrongfully caused" in a general, non-technical sense. *Knox*, 88 Ill. 2d at 416, 430 N.E.2d at 980. Yet this statement by the *Knox* court does not foreclose recovery in a case such as the present one, where a reasonably diligent person in plaintiff's position would allegedly have had no reason to believe that her injury might have been wrongfully caused by a product until years later.

¶ 33        Defendants nevertheless cite *Hoffman v. Orthopedic Systems, Inc.*, 327 Ill. App. 3d 1004, 765 N.E.2d 116 (2002), *McCormick v. Uppuluri*, 250 Ill. App. 3d 386, 621 N.E.2d 57 (1993), and *Wells v. Travis*, 284 Ill. App. 3d 282, 672 N.E.2d 789 (1996), for the proposition that, as soon as an injured plaintiff knows or should know that her injury might have been

wrongfully caused by any source, the statute of limitations begins to run as to all potential defendants and causes of action. However, these cases are at worst distinguishable and, in fact, can be construed as supportive of our reading of the discovery rule, since in all three of these cases, the court attributes significance to the fact that the plaintiff's untimely filing was due to the fact that he or she failed to conduct sufficient investigation within the statutory timeframe. Since the courts in these cases consistently rely upon the plaintiffs' lack of diligence in declaring their claims to be time-barred, it is implied that a different result might have been reached if the plaintiffs had acted with full diligence and still been unable to discover the claims at issue.

¶ 34    *Hoffman*, like the present case, involves a plaintiff injured in surgery who was aware of a potential malpractice claim but did not discover that she might have a products liability claim until years later. Four to six months after being severely injured as a result of back surgery, the *Hoffman* plaintiff asked her attorney to investigate any potential medical malpractice claim arising out of that surgery, though it would appear that she did not conduct any investigation into potential products liability claims or file any suit at that time. *Hoffman*, 327 Ill. App. 3d at 1007, 1011, 765 N.E.2d at 119, 122. Nearly three years after her injury, when the plaintiff returned to the same hospital for an unrelated surgery, hospital staff volunteered the information that her injuries had been caused by the surgical platform on which she was placed during the surgery. *Hoffman*, 327 Ill. App. 3d at 1007, 765 N.E.2d at 120. She then brought a product liability suit against the manufacturer of the surgical platform. *Hoffman*, 327 Ill. App. 3d at 1008, 765 N.E.2d at 120.

¶ 35    Under these facts, the *Hoffman* court found that plaintiff's claim was time-barred by the two-year statute of limitations for product liability actions, holding that it began to run no later than four to six months after her injury, when she requested that her attorney investigate a possible malpractice claim. *Hoffman*, 327 Ill. App. 3d at 1011, 765 N.E.2d at 122. It stated that the statute of limitations begins to run "when plaintiff becomes aware that the cause of the problem stems from another's negligence and not from natural causes," which, if read out of context, would seem to support defendants' position in the instant action. *Hoffman*, 327 Ill. App. 3d at 1010, 765 N.E.2d at 122. However, the *Hoffman* court did not rely upon this statement as a blanket principle that would apply regardless of a plaintiff's diligence but, rather, drew additional support from the fact that the plaintiff might have been able to discover her products liability claim within the limitations period if she had undertaken diligent inquiry. In this vein, the court stated:

> "Plaintiff's failure to pursue a more thorough inquiry to find the cause of her injuries does not excuse her from failing to comply with the statute of limitations. Plaintiff could have attempted to obtain the results of the hospital's investigation of this incident, with appropriate further investigation by her attorneys, particularly since Dr. Conrad voluntarily divulged its conclusions.
>
> *** It would be manifestly unjust to visit a stale claim upon a putative defendant by reason of inadequate investigative procedures, particularly where the Code and supreme court rules provide substantial avenues of inquiry to a plaintiff who knew that the potential for wrongdoing could have been the cause of her injuries." *Hoffman*, 327 Ill. App. 3d at 1011, 765 N.E.2d at 122.

Thus, the *Hoffman* decision appears to rely, at least in part, on its determination that plaintiff's product liability claim would have been discoverable through diligent investigation, a reliance which comports with our supreme court's concern that putative plaintiffs investigate potential claims instead of slumbering on their rights. See *Nolan*, 85 Ill. 2d at 171, 421 N.E.2d at 868.

¶ 36    Similarly, in *McCormick* and *Wells*, the court also relies in part upon plaintiffs' failure to investigate fully upon learning of their injuries in finding the claims at issue to be time-barred. Both of these cases are medical malpractice suits in which an injured plaintiff originally sought recovery against a certain doctor or doctors but did not discover facts implicating the defendant doctor until years later. In *McCormick*, the defendant physician treated plaintiff's kidney obstruction in 1984, and plaintiff's kidney subsequently became nonfunctional. *McCormick*, 250 Ill. App. 3d at 387, 621 N.E.2d at 58. Plaintiff brought a medical malpractice suit against two other physicians and the hospital, but not the defendant physician. *McCormick*, 250 Ill. App. 3d at 387, 621 N.E.2d at 58. More than two years later, plaintiff received a doctor's opinion that his injury was caused by the negligence of the defendant physician, and he brought a second medical malpractice suit against the defendant. *McCormick*, 250 Ill. App. 3d at 387, 621 N.E.2d at 58. The *McCormick* court found that this second suit was time-barred, holding that, as a matter of law, the statute of limitations began to run no later than the date upon which plaintiff filed his first medical malpractice suit, since he must have had knowledge at that time that he was injured and that such injury might have been wrongfully caused. *McCormick*, 250 Ill. App. 3d at 391-92, 621 N.E.2d at 61.

¶ 37    In reaching this conclusion, the *McCormick* court stated that a plaintiff's cause of action does not accrue when plaintiff becomes aware that his injury may have been caused by the wrongful actions of a particular defendant but, rather, as soon as he becomes aware that his injury may have been caused by wrongful conduct in general. *McCormick*, 250 Ill. App. 3d at 391, 621 N.E.2d at 61. However, the *McCormick* court also states: "Significantly, this is not a case where defendant's identity was concealed. His identity was disclosed in Ingalls' medical records which plaintiff possessed prior to filing the [initial] action. Any reasonable discovery attempts should have included ascertaining defendant's involvement in this case." *McCormick*, 250 Ill. App. 3d at 392, 621 N.E.2d at 61. Thus, the *McCormick* court explicitly relied upon plaintiff's lack of diligence in investigating potential claims arising from his injury. In doing so, it implies that a different result might be reached in a case such as the present one where plaintiff investigates diligently but is unable to discover a cause of her injury within two years.

¶ 38    Finally, in *Wells*, 284 Ill. App. 3d at 284, 672 N.E.2d at 791, following the death of plaintiff's decedent, the plaintiff brought a medical malpractice suit against a physician and then amended her action to add a second physician. The second physician successfully moved to dismiss the counts against him as time-barred, and the *Wells* court affirmed. *Wells*, 284 Ill. App. 3d at 284, 672 N.E.2d at 791. In filing her initial suit, plaintiff had relied on a report by her section 2-622 expert, who in essence opined that the first physician had committed malpractice, but the second physician had not. *Wells*, 284 Ill. App. 3d at 284, 672 N.E.2d at 791. During the course of discovery in that action, experts of the first physician opined that the second physician was the one at fault, prompting plaintiff to amend her action

-13-

to add the second physician. *Wells*, 284 Ill. App. 3d at 285, 672 N.E.2d at 791. Under these facts, the *Wells* court, following the *McCormick* decision, held that as a matter of law, the limitations period commenced as soon as plaintiff received the report from her expert which implicated the first physician and exonerated the second physician. *Wells*, 284 Ill. App. 3d at 292, 672 N.E.2d at 796. However, it is clear from the facts of the case that plaintiff was aware that the second physician was involved in the treatment of plaintiff's decedent, even though she originally did not believe him to have committed any negligence. *Wells*, 284 Ill. App. 3d at 284, 672 N.E.2d at 791. Moreover, the *Wells* court states, "[W]e will not create an exception to the statute of limitations because plaintiff elected to rely on the opinion of her chosen expert rather than continuing her investigation," implying that, if plaintiff had continued her investigation, she might have been able to uncover evidence implicating the second physician in decedent's death within the statutory period. *Wells*, 284 Ill. App. 3d at 292, 672 N.E.2d at 796. Thus, as with *Hoffman* and *McCormick*, *Wells* is, at the very least, distinguishable from the present case, and it does not run contrary to our holding that, where a plaintiff knows or should reasonably know one cause of her injury, but another cause remains both undiscovered and undiscoverable, the statute of limitations with regard to that second cause is tolled until such time as that second cause would become discoverable.

¶ 39 In this regard, we find the California case of *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914 (Cal. 2005), to be highly instructive, since, unlike *Hoffman*, *McCormick*, and *Wells*, it directly confronts the issue of when the statute of limitations begins for a plaintiff who is aware that her injury might have been "wrongfully caused" by medical malpractice but could not have discovered her potential product liability claim until years later. The California Supreme Court sums up its holding in *Fox* as follows:

> "We conclude that, under the delayed discovery rule, a cause of action accrues and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action. In that case, the statute of limitations for that cause of action will be tolled until such time as a reasonable investigation would have revealed its factual basis." *Fox*, 110 P.3d at 917.

¶ 40 The facts of *Fox* are analogous to those in the instant case. The plaintiff in *Fox* was injured as a result of gastric bypass surgery and brought a medical malpractice suit against the doctor who performed the surgery on April 6, 2000. *Fox*, 110 P.3d at 917. In a deposition given on August 13, 2001, the doctor testified that plaintiff's injuries might have been caused by a stapler used during her surgery. *Fox*, 110 P.3d at 918. Plaintiff subsequently amended her complaint on November 28, 2001, to add a products liability claim against the manufacturer of the stapler. *Fox*, 110 P.3d at 918. She specifically alleged that reasonable diligence would not have caused her to suspect the stapler as a cause of her injuries at any time before her doctor's deposition on August 13, 2001. *Fox*, 110 P.3d at 918. The manufacturer sought to dismiss the products liability claim under California's one-year statute of limitations for products liability actions. *Fox*, 110 P.3d at 918.

¶ 41 In assessing these facts, the California Supreme Court applied its discovery rule, which "postpones accrual of a cause of action until the plaintiff discovers, or has cause to discover,

-14-

the cause of action." *Fox*, 110 P.3d at 920. As in Illinois, the period of limitations in California is not dependent upon a plaintiff's knowledge that the specific elements of a cause of action have been satisfied; instead, the court looks to whether plaintiffs have reason to believe that they have been injured by wrongdoing. *Fox*, 110 P.3d at 920. Under this rule, the *Fox* court held that the plaintiff's claim would not be time-barred as long as she could plead and prove facts supporting her allegation that she did not have reason to discover facts supporting her products liability action until after her doctor's deposition. *Fox*, 110 P.3d at 922-23. More broadly, the court found that "if a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim." *Fox*, 110 P.3d at 924.

¶ 42    In rendering this holding, the *Fox* court explicitly rejected the proposition that " '[w]hen a plaintiff has cause to sue based on knowledge or suspicion of negligence the statute starts to run as to *all* potential defendants.' " (Emphasis in original.) *Fox*, 110 P.3d at 917 (quoting *Bristol-Myers Squibb Co. v. Superior Court*, 38 Cal. Rptr. 298, 304 (Cal. Ct. App. 1995)). The court explained:

> "Were plaintiffs required to file all causes of action when one cause of action accrued, *** they would run the risk of sanctions for filing a cause of action without any factual support. [Citations.] Indeed, it would be difficult to describe a cause of action filed by a plaintiff, before that plaintiff reasonably suspects that the cause of action is a meritorious one, as anything but frivolous." *Fox*, 110 P.3d at 925.

The *Fox* court further emphasized that such a rule would not encourage plaintiffs to employ dilatory tactics or "wait for the facts." *Fox*, 110 P.3d at 925. It explained that, in order to utilize the discovery rule to delay accrual of a cause of action, a plaintiff must show that she was unable to have discovered the necessary information earlier despite reasonable diligence. *Fox*, 110 P.3d at 925. Thus, plaintiffs who chose to wait instead of diligently investigating would not be able to avoid summary judgment on statute of limitations grounds. *Fox*, 110 P.3d at 925.

¶ 43    We find the rule and the reasoning of *Fox* to be in line with the discovery rule as it has developed in Illinois, for the reasons stated above. In particular, as noted, Illinois has an interest in encouraging reasonable diligence by plaintiffs in investigating potential tort claims (*Knox*, 88 Ill. 2d at 416, 430 N.E.2d at 980; *Nolan*, 85 Ill. 2d at 171, 421 N.E.2d at 868; *Witherell*, 85 Ill. 2d at 156, 421 N.E.2d at 874); this rule will ensure that claims do not accrue before they could have been discovered through reasonable diligence and, at the same time, will not permit plaintiffs to slumber on their rights.

¶ 44    Due to our resolution of this issue, we need not reach plaintiff's contention that interpretation of the discovery rule to bar her product liability claims would be a violation of her procedural due process rights and her right to equal protection of the laws.

¶ 45                                                    B

¶ 46    Defendants finally contend that, notwithstanding the foregoing, the trial court was correct in dismissing plaintiff's product liability claims as time-barred because plaintiff should have

-15-

known that her injury might have been caused by defendants' product no later than August 9, 2006, the date of Dr. Romeo's first deposition, when he mentioned that postoperative delivery of the anesthetic Marcaine via a pain pump might have been a contributing cause to plaintiff's injury.

¶ 47 At the outset, plaintiff argues that we do not have jurisdiction to consider this question, since, in granting defendants' motion to dismiss, the trial court accepted defendants' construction of the discovery rule and explicitly rejected the need to reach this issue. However, we disagree with plaintiff's contention, as we may affirm on any basis appearing in the record, whether or not the trial court relied on that basis. See, *e.g.*, *Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 347-48, 662 N.E.2d 397, 409 (1996) (affirming portion of decision for reasons different from those relied upon by the courts below); *King v. Paul J. Krez Co.*, 323 Ill. App. 3d 532, 536, 752 N.E.2d 605, 608 (2001).

¶ 48 Plaintiff nevertheless cites *Goodrich v. Sprague*, 376 Ill. 80, 86, 32 N.E.2d 897, 900 (1941), for the proposition that an appellate court may not rule upon matters that were not ruled upon by the trial court. In *Goodrich*, after a trial, the jury found in favor of the plaintiff. *Goodrich*, 376 Ill. at 82, 32 N.E.2d at 898. The defendant filed a motion for judgment notwithstanding the verdict and, in the alternative, a motion for a new trial. *Goodrich*, 376 Ill. at 82, 32 N.E.2d at 898. The trial court granted the defendant's motion for judgment notwithstanding the verdict and therefore did not rule upon its motion for a new trial. *Goodrich*, 376 Ill. at 82, 32 N.E.2d at 898. On appeal, the appellate court reversed the trial court with regard to the motion for judgment notwithstanding the verdict. *Goodrich*, 376 Ill. at 82, 32 N.E.2d at 898. It then denied the defendant's motion for a new trial and entered judgment for the estate. *Goodrich*, 376 Ill. at 82, 32 N.E.2d at 898. Our supreme court held that the appellate court lacked jurisdiction to rule upon the defendant's motion for a new trial, insofar as that motion had not been ruled upon by the trial court. *Goodrich*, 376 Ill. at 86, 32 N.E.2d at 900. It was in this context that the *Goodrich* court explained that "the Appellate Court's jurisdiction is appellate, and extends only to those matters in controversy which have been ruled upon by the trial court." *Goodrich*, 376 Ill. at 86, 32 N.E.2d at 900.

¶ 49 *Goodrich* is inapplicable to the instant case because, unlike in *Goodrich*, we are not ruling upon a motion which the trial court declined to consider. Rather, we are considering the merits of defendants' motion to dismiss, a motion which the trial court granted. Defendants are merely attempting to proffer alternative grounds for granting a motion upon which the trial court has already ruled and from which the instant appeal was taken. This motion would therefore be a "matter[ ] in controversy which [has] been ruled upon by the trial court" within the meaning of *Goodrich*. The case of *Canel & Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 921-22, 710 N.E.2d 861, 874 (1999) (where trial court failed to rule on defendants' section 2-619 motion, appellate court lacked jurisdiction over the merits of that motion), also cited by plaintiff on this point, is likewise inapplicable to the situation at hand.

¶ 50 Plaintiff's attempted reliance on *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 856 N.E.2d 1048 (2006), and on *Williams v. Board of Education of the City of Chicago*, 222 Ill. App. 3d 559, 584 N.E.2d 257 (1991), is similarly misplaced. Both of these cases deal with waiver and forfeiture. Thus, in *Marshall*, 222 Ill. 2d at 430-31, 856 N.E.2d at 1054, the court found that defendants forfeited their argument that their conduct did not proximately cause

the decedent's injuries because they did not raise such argument before the trial court. Similarly, in *Williams*, 222 Ill. App. 3d at 565-66, 584 N.E.2d at 266, where defendant sought a dismissal order from the trial court based solely on the statute of limitations, defendant was held to have waived any tort immunity argument on appeal. However, in the instant case, defendants properly raised the argument before the trial court, urging that, even if plaintiff's interpretation of the discovery rule were correct, the statute of limitations would have begun to run on her claim no later than August 9, 2006, when Dr. Romeo gave his first deposition. Notwithstanding that the argument was properly raised, the court found no need to address it. Thus, unlike in *Marshall* and *Williams*, the argument here was not waived or forfeited.

¶ 51   Nor can support for plaintiff's jurisdictional argument be found in the final case cited by plaintiff on this matter, *Graves v. Illinois Liquor Control Comm'n*, 55 Ill. App. 3d 888, 892, 371 N.E.2d 368, 371 (1977), since *Graves* does not deal with any jurisdictional limitation but, rather, the inability of a court of appeal to decide an issue where the record is inadequate for decision. The *Graves* court reversed the revocation of plaintiff's liquor license by the State of Illinois Liquor Control Commission, holding that the charges against plaintiff were insufficiently clear and specific to allow the preparation of a defense. *Graves*, 55 Ill. App. 3d at 891-92, 371 N.E.2d at 370. The Commission nevertheless argued that, even if the charges against the plaintiff were not proper, a revocation was supported by evidence adduced at the hearing before the Commission. *Graves*, 55 Ill. App. 3d at 892, 371 N.E.2d at 371. The *Graves* court declined to consider this contention, explaining, "To attempt to consider and review the evidence adduced at a hearing which was commenced by charges so inadequate as to hamper the preparation of a defense would be an exercise in *reductio ad absurdum*." *Graves*, 55 Ill. App. 3d at 892, 371 N.E.2d at 370. Thus, the court is not stating a jurisdictional limitation but finding that, under the circumstances, the court did not have sufficient facts to render a ruling on the merits. *Graves*, 55 Ill. App. 3d at 892, 371 N.E.2d at 370.

¶ 52   Plaintiff next contends substantively that the question of when she knew or should have known that her injury might have been wrongfully caused by a pain pump is a disputed question of fact and therefore cannot be resolved upon a motion to dismiss. We agree. The question of when a party knew or reasonably should have known that she was injured and that her injury was wrongfully caused is a question of fact unless the facts are undisputed and only a single conclusion may be drawn from them. *Nolan*, 85 Ill. 2d at 171, 421 N.E.2d at 868-69 (remanding for determination of this factual issue); *Knox*, 88 Ill. 2d at 416, 430 N.E.2d at 981 (also remanding).

¶ 53   With regard to Dr. Romeo's 2006 deposition testimony, upon which defendants attempt to rely, plaintiff argues that such testimony does not unambiguously point to a causal link between plaintiff's injury and the use of a pain pump. Rather, she argues, it points to a causal link between plaintiff's injury and the use of the anesthetic Marcaine, which incidentally would have been administered via a pain pump:

"A third possibility which has become more apparent recently is the use of an interarticular anesthetic agent, particularly a medicine called Marcaine, and so the use of a postoperative interarticular pain pump, which I'm not aware of whether that was

-17-

done or not, has been shown over the last year-and-a-half to two years to be highly associated with a condition where articular cartilage is aggressively lost in the shoulder after arthroscopic stabilization."

Plaintiff further argues that this interpretation is supported by Dr. Romeo's November 23, 2009, affidavit, submitted by plaintiff to the court in opposition to defendants' motion to dismiss, in which Dr. Romeo specifically disclaims having had any knowledge in 2006 that pain pumps themselves were potentially unsafe:

"[M]y [2006] testimony only reflected the length of time and the amount of medication that was delivered by the pain pump, and was not intended nor did it reflect any information that any pain pump may be potentially unsafe or had lack of warnings. *** At my deposition on August 9, 2006, I had no information, and when asked, imparted no information to Mr. Goodman [plaintiff's attorney], that the pain pumps were unsafe or unreasonably dangerous, or negligently designed or manufactured."

In that affidavit, Dr. Romeo additionally denies any possibility that plaintiff could have discovered the connection between her injury and the pain pump prior to the summer of 2007:

"It is my understanding, and opinion to a reasonable degree of medical certainty, that any information concerning potential chondrolysis caused by the wrongful use of pain pumps did not occur by publication for which a patient or other lay person might realize that chondrolysis might be wrongfully caused by pain pumps or their design or lack of warnings or instructions until the summer of 2007."

This is consistent with plaintiff's allegation in her amended complaint that she could not have discovered her potential products liability claim before the summer of 2007 because "[p]rior to the summer of 2007, information concerning potential chondrolysis caused by pain pumps did not exist."

¶ 54    Based upon the averments of Dr. Romeo in his affidavit, as well as the facial ambiguity of Dr. Romeo's 2006 testimony as to the nature of the link between Marcaine, pain pumps, and chondrolysis, we find that it would not be unreasonable for a finder of fact to conclude that a reasonable person in plaintiff's position could not have been aware that her injury might have been wrongfully caused by a pain pump until the summer of 2007, due to the alleged lack of published information on the causal link between pain pumps and chondrolysis prior to that time. Accordingly, in ruling upon defendants' motion to dismiss, it would be inappropriate for us to resolve the disputed issue of fact as to whether plaintiff could have discovered her claim through reasonable diligence prior to the summer of 2007. See *Nolan*, 85 Ill. 2d at 171, 421 N.E.2d at 868-69; *Knox*, 88 Ill. 2d at 416, 430 N.E.2d at 981.

¶ 55    We note parenthetically that defendants have not attempted to preclude the use of Dr. Romeo's subsequent affidavit to explain or modify his testimony in his 2006 deposition. Nor is it conclusive that any such argument would be likely to succeed in any event, although there is authority to indicate that, where an expert witness of a party makes a clear, deliberate, and unequivocal statement of fact, such statement may be treated as the equivalent

-18-

of a judicial admission so as to preclude subsequent contradiction by the deponent. See *Schmall v. Village of Addison*, 171 Ill. App. 3d 344, 348, 525 N.E.2d 258, 262 (1988); *Tongate v. Wyeth Laboratories*, 220 Ill. App. 3d 952, 962, 580 N.E.2d 1220, 1227 (1991). However, such rule would only apply to testimony that is clear, deliberate, and unequivocal; by contrast, where the testimony at issue is ambiguous in context, subsequent clarification is permitted. *Schmall*, 171 Ill. App. 3d at 349, 525 N.E.2d at 262-63 (expert's deposition testimony did not so unequivocally establish defendant's freedom from negligence as to preclude explanation by affidavit); *Tongate*, 220 Ill. App. 3d at 962, 580 N.E.2d at 1227-28 (even if witness's deposition testimony were "subject to the judicial admission rule," it was insufficiently clear and unequivocal as to bar explanatory clarification in later deposition); *cf. Young v. Pease*, 114 Ill. App. 3d 120, 124, 448 N.E.2d 586, 589 (1983) (where deponent "has not made deliberate, repeated and unequivocal statements, it is possible, for purposes of a motion for summary judgment, to controvert the claimed admissions made in those statements").

¶ 56    As urged by the plaintiff, it is at best unclear whether Dr. Romeo's 2006 testimony is referring to knowledge that would find fault with the use of the drug Marcaine or whether he is indicating a deficiency in the pain pump resulting from any inadequacy or defect. Thus, subsequent clarification would be permitted. However, in any event, even if the expert's testimony were sufficiently clear and deliberate, any potential argument as to whether his subsequent affidavit could contradict his earlier deposition testimony would be subject to forfeiture since defendants failed to raise this issue at any time. See Ill. S. Ct. Rs. 341(h)(7), (i) (eff. July 1, 2008); *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 143 n.2, 849 N.E.2d 349, 358 n.2 (2006) (plaintiffs forfeited issue where they failed to raise it in their brief before the court); *Berggren v. Hill*, 401 Ill. App. 3d 475, 479, 928 N.E.2d 1225, 1229 (2010) (plaintiff forfeited argument on appeal by failing to raise that argument in her appellate brief); *In re Mark W.*, 383 Ill. App. 3d 572, 587, 895 N.E.2d 925, 938 (2008) (failure to raise issue on appeal may be deemed forfeiture of that issue); *Maun v. Department of Professional Regulation*, 299 Ill. App. 3d 388, 399, 701 N.E.2d 791, 799-800 (1998) (plaintiff forfeited argument that he failed to raise in his appellate brief).

¶ 57    Therefore, for the foregoing reasons, the judgment of the trial court is reversed and remanded for proceedings not inconsistent with this opinion.

¶ 58    Reversed and remanded.